**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF MISSISSIPPI**

**SOUTHERN DIVISION**

| | |
|---|---|
| **MOCHA MYERS, individually, and on behalf of her deceased minor child, K.W.**<br>**PLAINTIFFS**<br>**vs.**<br>**PFIZER, INC. and GLOBAL BLOOD THERAPEUTICS, INC.**<br>**DEFENDANTS** | **CIVIL COMPLAINT**<br><br>**CASE NO. 1:26cv266 LG-RPM** |

## COMPLAINT FOR DAMAGES

**COMES NOW**, by and through undersigned counsel, William H. Eckert, Michael J. Tarleton, Daniel G. Collarini, and the law firm of Eckert & Tarleton, LLC and Toby Tatum of the Tatum Law Firm, Mocha Myers, individually and on behalf of her deceased minor child, K.W., who brings this civil action for damages against Pfizer, Inc. and Global Blood Therapeutics, Inc. and alleges the following:

## PARTIES

I. (1)

Made Plaintiff herein is Mocha Myers, an adult of the full age of majority, and who resides in, and is a citizen of, the State of Mississippi, who is domiciled in Saucier, Mississippi, in Harrison County, Mississippi.

(2)

Made Defendants in this matter are:

1. Pfizer, Inc., a corporation, who is incorporated in the State of Delaware, and whose principal place of business is located at 66 Hudson Boulevard East, New York, New York 10001, and who is licensed to do, and is doing business in, the State of Mississippi. Pfizer, Inc. may be served with process through its Agent for Service of Process, CT Corporation System, located at 8927 Lorraine Road, Suite 204-A, Gulfport, Mississippi 39503;
2. Global Blood Therapeutics, Inc. a corporation who is incorporated in the State of Delaware, and whose principal place of business is located at 181 Oyster Point Boulevard, South San Francisco, California 94080. Upon information and belief, this Defendant has not appointed an Agent for Service of Process in the State of Mississippi, but who may be served via Mail pursuant to Rule 4 of the Miss. Rules Civ. Pro.

**JURISDICTION AND VENUE**

II.

Jurisdiction is proper in this Court, as the Plaintiff and the Defendant are completely diverse, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and therefore, jurisdiction exists in this Court pursuant to 28 U.S.C. §1332(a).

Venue is proper in this Court pursuant to 28 U.S.C. §1391, as the acts and omissions complained about occurred in Harrison County, Mississippi, and the Defendants are subject to the personal jurisdiction of this Court.

This Court has personal jurisdiction over both Defendants, as they are businesses which market their products to customers in Mississippi, and intentionally have availed themselves of the Mississippi market through the marketing, sale, and use of their products in Mississippi, sufficient to establish minimum contact with the State of Mississippi and to confer jurisdiction in Mississippi

over these Defendants.

## BACKGROUND AND FACTS
## INTRODUCTION

III.

The Plaintiff is the mother of K.W., a minor child who resided with the Plaintiff in Harrison County, Mississippi. K.W. was diagnosed with sickle cell anemia disease ("sickle cell") at a young age.

IV.

As part of his treatment regimen, K.W., age 7 at the time, was prescribed Oxbryta by his treating physicians, to help mitigate his sickle cell symptoms. K.W. was first prescribed, and began taking, Oxbryta, in late 2022, and continued taking Oxbryta for months, until he decreased his intake of the medication per doctors' orders due to complications from the medication.

V.

On September 19, 2023, shortly after ceasing taking the medication, K.W. died due to blood clots in his heart and lung at the age of 8.

VI.

Upon information and belief, Oxbryta, whose generic name is voxelotor, is a prescription medication intended to be used to treat sickle cell disease in adults and children who are four years of age or older, and was manufactured and marketed as an oral, once-daily medication as therapy for patients with sickle cell disease.

VII.

Oxbryta was developed, researched, and produced by Global Blood Therapeutics in the years prior to 2019. In November of 2019, Global Blood Therapeutics obtained accelerated

approval of Oxbryta from the FDA.

VIII.

On October 5, 2022, Defendant Pfizer, Inc. announced the acquisition of Global Blood Therapeutics, purchasing the stock of Global Blood Therapeutics at an estimated value of $5.4 billion.

IX.

Upon information and belief, Defendant Global Blood Therapeutics is a wholly owned subsidiary of Defendant Pfizer.

X.

Upon information and belief, all Defendants do/did business in the State of Mississippi by, among other things, distributing, marketing, selling and/or profiting from Oxbryta in Mississippi as well as throughout the United States, including employing representatives to encourage physicians to prescribe Oxbryta in the State of Mississippi.

XI.

At all times material herein, Defendants were, and still are, pharmaceutical companies involved in the manufacturing, research, development, marketing, distribution, sale, and release for use to the general public of pharmaceuticals, including Oxbryta, throughout the United States.

XII.

On September 25, 2024, Defendants announced that they were voluntarily withdrawing all lots of Oxbryta, in all markets where it is approved, including Mississippi. The decision came after "data showed an imbalance in Vaso-occlusive crises, a complication of the disease and "fatal events" that required further assessment."

XIII.

The Plaintiff avers and alleges that K.W. died due to increased vaso-occlusive crises as a result of taking Oxbryta, and the Defendants knowingly marketed and sold a drug which they knew or should have known caused increased vaso-occlusive crises yet failed to advise or warn K.W. and the Plaintiff of these potentially deadly side effects.

## SICKLE CELL DISEASE AND OXBRYTA

XIV.

As compared to the placebo group in post-marketing studies or that there were higher rates of vaso-occlusive crises in patients with sickle cell disease receiving Oxbryta in two real-world registry studies.

## GENERAL ALLEGATIONS
## SICKLE CELL DISEASE

XV.

Sickle cell is a group of inherited red blood cell disorders. Red blood cells contain hemoglobin, a protein that carries oxygen. Healthy red blood cells are round, and they move through small blood vessels to carry oxygen to all parts of the body. In someone who has sickle cell, the hemoglobin is abnormal, which causes the red blood cells to become hard and sticky and look like a C-shaped farm tool called a sickle. The sickle cells die early, which causes a constant shortage of red blood cells. Also, when they travel through small blood vessels, sickle cells get stuck and clog the blood flow. This can cause pain and other serious complications (health problems) such as infection, acute chest syndrome, and stroke.

XVI.

There are several types of sickle cell. The specific type of sickle cell a person has depends on the genes they inherited from their parents. People with sickle cell inherit genes that contain instructions, or code, for abnormal hemoglobin, including:

i. **HbSS:** People who have this form of sickle cell inherit two genes, one from each parent, that code for hemoglobin "S." Hemoglobin S is an abnormal form of hemoglobin that causes the red cells to become rigid, and sickle shaped. This is commonly called sickle cell anemia and is usually the most severe form of the disease.

ii. **HbSC**: People who have this form of sickle cell inherit a hemoglobin S gene from one parent and a gene for a different type of abnormal hemoglobin called "C" from the other parent. This is usually a milder form of sickle cell.

iii. **HbS beta thalassemia**: People who have this form of sickle cell inherit a hemoglobin S gene from one parent and a gene for beta thalassemia, another type of hemoglobin abnormality, from the other parent. There are two types of beta thalassemia: "zero" (HbS beta0) and "plus" (HbS beta+). Those with HbS beta0-thalassemia usually have a severe form of sickle cell. People with HbS beta+-thalassemia tend to have a milder form of sickle cell.

XVII.

Sickle cell is diagnosed with a simple blood test. In children born in the United States, it most often is found at birth during routine newborn screening tests at the hospital. In addition, sickle cell can be diagnosed while the baby is in the womb. Diagnostic tests before the baby is born, such as chorionic villus sampling and amniocentesis, can check for chromosomal or genetic abnormalities in the baby. Chorionic villus sampling tests a tiny piece of the placenta called

chorionic villus. Amniocentesis tests a small sample of amniotic fluid surrounding the baby.

XVIII.

The active substance in Oxbryta, was supposed to work by improving the ability of the hemoglobin to hold on to oxygen, and preventing it from forming chains. In theory, this would help the red blood cells to maintain normal shape and flexibility, reducing their excess breakdown and improving their lifespan.

XIX.

The FDA approved Oxbryta under the accelerated approval pathway in 2019 for the treatment of sickle cell disease in adults and pediatric patients 12 years of age and older. In 2021, FDA granted accelerated approval of Oxbryta for the treatment of sickle cell disease in patients 4 to 11 years of age. Accelerated approval is based on a surrogate or intermediate clinical endpoint that is reasonably likely to predict clinical benefit, allowing for earlier approval of drugs that treat serious conditions and fill an unmet medical need. In general, FDA requires post-marketing studies to verify and describe the clinical benefit of medications approved under this program.

XX.

Defendants marketed Oxbryta through various forms of media and promised its purchasers would "experience less sickling."

Defendant Global Blood Therapeutics called Oxbryta a "firsts-of-its-kind tablet that treats sickle cell. . ." and would lead to "less sickling" by "address[ing] sickling at its source."

XXI.

On September 25, 2024, Defendants announced they were voluntarily withdrawing the medication from the market, ceasing distribution, and discontinuing all active clinical trials and

expanded access programs for Oxbryta "because recent data indicate the benefit of Oxbryta does not outweigh the risks for the sickle cell patient population."

XXII.

Defendants noted that their decision was "based on the totality of clinical data that now indicates the overall benefit of OXBRYTA no longer outweighs the risk in the approved sickle cell patient population. The data suggest an imbalance in vaso-occlusive crises and fatal events which require further assessment."

XXIII.

According to the European Medicines Agency, Study GBT440-032 is assessed the effects of voxelotor on the transcranial doppler ultrasound measurements of cerebral arterial blood flow in children from 2 to 15 years of age with SCD and are at high risk of stroke. The study recruited 236 patients from Egypt, Ghana, Kenya, Nigeria, Oman, Saudi Arabia, the United States and the United Kingdom. There were 8 deaths in people taking voxelotor and 2 deaths in people taking placebo.

XXIV.

Study GBT440-042 assessed the effects of voxelotor on leg ulcers in 88 patients from 12 years of age recruited from Brazil, Kenya and Nigeria. Eight deaths occurred in the open-label part of this study.

"The initiation of the review follows an imbalance of deaths between voxelotor and placebo observed in clinical trials," the European Medicines Agency has advised.

**<u>K.W. AND THE ADMINISTRATION OF OXBRYTA</u>**

XXV.

K.W. was diagnosed with sickle cell disease at a young age.

XXVI.

Prior to November of 2022, K.W. suffered from periodic abdominal pains due to his sickle cell disease and would seek treatment from hospitals near his home.

XXVII.

In the summer of 2022, K.W. was referred to USA Women's and Children's Hospital in Mobile, Alabama, where the staff referred K.W. to Dr. Felicia Wilson, a pediatric hematologist.

XXVIII.

In late 2022, K.W. was prescribed Oxbryta to alleviate his sickle cell symptoms, yet, despite the purpose of Oxbryta being the alleviation of sickle cell symptoms, K.W. began to suffer from increased abdominal pains, swelling, and other debilitating symptoms, all caused by Oxbryta.

XXIX.

Despite these pains and increased symptoms as a result of taking Oxbryta, K.W.'s physician advised him to continue the medication but to cut the pills in half to see if the reduced dosage would reduce K.W.'s symptoms.

XXX.

However, despite reducing the dosage of the Oxbryta, K.W. continued to suffer from increased abdominal pains, swelling, and other debilitating systems, until K.W. ceased taking Oxbryta at some time in February or March of 2023.

XXXI.

At the time he was prescribed Oxbryta, neither K.W. nor his mother were made aware that Oxbryta caused a higher rate of vaso-occlusive crises than for those who were taking placebos, and Plaintiff and K.W. were unaware that there were more deaths in the Oxbryta treatment group than the control/placebo group in post-marketing studies. It was only after K.W.'s death that his

mother, Mocha Myers, received a telephone call from a Pfizer representative that K.W. should cease taking Oxbryta, but, unfortunately, that advice from Pfizer was too late.

XXXII.

K.W. and his mother were also unaware, and they were never informed, that there were higher rates of vaso-occlusive crises and deaths in patients who were taking Oxbryta than in two real-world registry studies.

Oxbryta was at all times utilized and prescribed in a manner foreseeable to Defendants, as Defendants generated the instructions for use. K.W. and his physicians foreseeably used Oxbryta, and did not misuse or alter Oxbryta in an unforeseeable manner.

As a direct result of being prescribed and consuming Oxbryta, Plaintiff has been permanently and severely injured, having suffered serious consequences.

XXXIII.

As a direct and proximate result of his Oxbryta use, K.W. suffered severe physical pain and sustained permanent injuries – death - and significant emotional distress, pain and suffering and loss of economic opportunity as a result. His mother has also suffered significant loss of consortium, society, love and affection for the loss of her son.

**COUNT ONE – PRODUCTS LIABILITY – DEFECT IN DESIGN**
**STRICT LIABILITY – MISS. CODE ANN. §11-1-63**

XXXIV.

The Petitioner re-avers, re-alleges, and re-iterates all prior allegations as if set forth herein, *in extenso*.

XXXV.

At the time of its manufacture, distribution, marketing ,promotion, and sale, Oxbryta

contained chemical formulae, as inherent in its make-up, manufacture, and identity, which were defective in design and were unreasonably dangerous to consumers, especially those consumers who relied upon Oxbryta to treat their sickle cell disease. The Defendants intentionally placed a known defective product into the stream of commerce and marketed Oxbryta to physicians and consumers who suffered from sickle cell disease. The Defendants, at all relevant times, designed, researched, developed, manufactured, produced, marketed, and sold Oxbryta to persons, such as K.W.

XXXVI.

At all relevant times, Oxbryta was dangerous in its design, and was dangerous for its intended use as a treatment and medication for sickle cell disease.

XXXVII.

At all relevant times, Oxbryta, designed, manufactured, distributed, marketed, and sold by the Defendants, had, as an inherent characteristic of Oxbryta, the dangerous side effects, which, were so substantially inherent in the product's make-up, that the product could not be changed without materially altering or compromising the product's usefulness.

XXXVIII.

The Defendants knew or should have known that the unreasonably dangerous product and effective chemical contained in Oxbryta would cause the medical conditions, including increased vaso-occlusive crises, which led to the death of K.W.

XXXIX.

At all relevant times, the Defendants knew, or should have known, that Oxbryta presented an unreasonable danger – including the potential for death - to those persons, such as K.W., who were prescribed Oxbryta.

XL.

The inherent characteristics of Oxbryta rendered the product unreasonably dangerous to the public, and to K.W.

XLI.

The defective and unreasonably dangerous characteristics of Oxbryta proximately caused the suffering and death of K.W.

XLII.

The Defendants are strictly liable unto K.W. and Mocha Myers for the damages they have suffered.

XLIII.

The Plaintiff had no knowledge that Oxbryta's chemical make-up was dangerous in any way to K.W.'s safety.

**COUNT TWO - PRODUCTS LIABILITY – DEFECT FOR FAILURE TO WARN STRICT LIABILITY – MISS. CODE ANN. §11-1-63**

XLIV.

The Petitioner re-avers, re-alleges, and re-iterates all prior allegations as if set forth herein, *in extenso*.

XLV.

At the time of its manufacture, distribution, marketing ,promotion, and sale, Oxbryta contained chemical formulae, as inherent in its make-up, manufacture, and identity, which were defective in design and were unreasonably dangerous to consumers, especially those consumers who relied upon Oxbryta to treat their sickle cell disease. The Defendants intentionally placed a known defective product into the stream of commerce and marketed Oxbryta to physicians and

consumers who suffered from sickle cell disease. The Defendants, at all relevant times, designed, researched, developed, manufactured, produced, marketed, and sold Oxbryta to persons, such as K.W.

XLVI.

At the time Oxbryta left the control of the Defendants, Oxbryta failed to contain adequate warnings regarding the use of Oxbryta that the Defendants knew, or, in light of reasonably available knowledge, should have known about the dangers that Oxbryta presented to the public.

XLVII.

Yet, despite knowing of these dangers, the Defendants failed to remedy the defective product either by immediately recalling Oxbryta, sending our warnings to all persons who had been prescribed Oxbryta, sending out warnings to all physicians to whom Oxbryta had been marketed, or any other action to warn and advise persons, such as Ms. Myers and K.W. of the inherent defect and unreasonable danger that Oxbryta presented.

XLVIII.

The defective and unreasonably dangerous characteristics of Oxbryta proximately caused the suffering and death of K.W.

XLIX.

The Defendants are strictly liable unto K.W. and Mocha Myers for the damages they have suffered.

L.

The Plaintiff had no knowledge that Oxbryta's chemical make-up was dangerous in any way to K.W.'s safety.

**COUNT THREE - PRODUCTS LIABILITY – DEFECT FOR FAILURE TO CONFORM TO AN EXPRESS OR IMPLIED WARRANTY OR OTHER FACTUAL REPRESENTATIONSTRICT LIABILITY – MISS. CODE ANN. §11-1-63**

LI.

The Petitioner re-avers, re-alleges, and re-iterates all prior allegations as if set forth herein, *in extenso*.

LII.

At the time of its manufacture, distribution, marketing ,promotion, and sale, Oxbryta contained chemical formulae, as inherent in its make-up, manufacture, and identity, which were defective in design and were unreasonably dangerous to consumers, especially those consumers who relied upon Oxbryta to treat their sickle cell disease. The Defendants intentionally placed a known defective product into the stream of commerce and marketed Oxbryta to physicians and consumers who suffered from sickle cell disease. The Defendants, at all relevant times, designed, researched, developed, manufactured, produced, marketed, and sold Oxbryta to persons, such as K.W.

LIII.

The Defendants manufactured, marketed, sold, distributed, and placed into commerce a product (Oxbryta) that failed to conform to the express and implied factual representations as to the purpose of, and the safety of, Oxbryta.

LIV.

The Plaintiff and K.W., as well as K.W.'s physicians, relied upon the express and implied guarantees of the Defendants that Oxbryta was safe to use for persons with sickle cell disease, such as K.W., and it was this attestation of safety of the product which led K.W.'s physicians to prescribe Oxbryta to K.W., and for Ms. Myers to allow K.W. to consume/take Oxbryta.

LV.

The Defendants knew or should have known that Oxbryta caused increased vaso-occlusive crises in persons with sickle cell disease, such as K.W., yet not only failed to warn K.H, but continued to sell the product knowing that it could lead to the death of K.W. (and others similarly situated).

LVI.

Ms. Myers and K.W. justifiably relied on the attestations of the Defendants that Oxbryta was safe for use.

LVII.

The defective and unreasonably dangerous characteristics of Oxbryta proximately caused the suffering and death of K.W.

LVIII.

The Defendants are strictly liable unto K.W. and Mocha Myers for the damages they have suffered.

LIX.

The Plaintiff had no knowledge that Oxbryta's chemical make-up was dangerous in any way to K.W.'s safety, and in fact relied upon the marketing of the product by the Defendants as reassurance that Oxbryta was safe for K.W. to use.

**<u>COUNT FOUR – NEGLIGENCE</u>**

LX.

The Petitioner re-avers, re-alleges, and re-iterates all prior allegations as if set forth herein, *in extenso*.

LXI.

At the time of its manufacture, distribution, marketing ,promotion, and sale, Oxbryta contained chemical formulae, as inherent in its make-up, manufacture, and identity, which were defective in design and were unreasonably dangerous to consumers, especially those consumers who relied upon Oxbryta to treat their sickle cell disease. The Defendants intentionally placed a known defective product into the stream of commerce and marketed Oxbryta to physicians and consumers who suffered from sickle cell disease. The Defendants, at all relevant times, designed, researched, developed, manufactured, produced, marketed, and sold Oxbryta to persons, such as K.W.

LXII.

The Defendants had a duty to place a safe medication into the stream of commerce, and to ensure that its products were safe for their intended use.

LXIII.

At all relevant times, the Defendants knew, or should have known of the hazards and dangers of Oxbryta.

LXIV.

At all relevant times, the Defendants knew, or should have known that the use of Oxbryta by K.W. would or could cause the injuries he sustained, including death.

LXV.

The Defendants breached their duty to K.W. and to Ms. Myers by failing to exercise reasonable care in the design, manufacture, testing, and sale of Oxbryta, including owing a duty of care to consumers and the general public in providing a safe medication, and accurate, true, and correct information about the risks of using Oxbryta.

LXVI.

The Defendants failed in their duties, and breached their duties, which proximately caused the injuries to, and death of, K.W.

**COUNT FIVE – RECKLESSNESS – PUNITIVE DAMAGES**

LXVII.

The Petitioner re-avers, re-alleges, and re-iterates all prior allegations as if set forth herein, *in extenso*.

LXVIII.

The actions of the Defendants in placing a product into the stream of commerce which the Defendants knew, or should have known, was dangerous, and could lead to serious bodily injuries and death to the persons who took the Defendants' product, was grossly negligent, reckless, wanton, and in complete disregard for the safety of the citizens of Mississippi, including, and especially, K.W.

LXIX.

Pursuant to Miss. Code Ann. §11-1-65, punitive damages are to be awarded when the actions of a defendant are conducted with actual malice or gross negligence which evidences a willful, wanton or reckless disregard for the safety of others.

LXX.

The actions of the Defendants, in which they knew, or should have known, that Oxbryta was a danger to persons with sickle cell disease, such as K.W. who would seek out any medication that could help him live as normal a life as possible, yet was provided Oxbryta through the machinations of the Defendants who marketed, distributed, and sold the medication, which caused the death of K.W., was willful, wanton, and reckless, and presented a blatant disregard for the life

of K.W.

LXXI.

Punitive damages are therefore warranted against the Defendants.

**DAMAGES**

LXXII.

The Petitioner re-avers, re-alleges, and re-iterates all prior allegations as if set forth herein, *in extenso*.

LXXIII.

As a result of the actions of the Defendants, which proximately caused the damages suffered by the Plaintiff, Mocha Myers Plaintiff herein, has suffered the following damages:

a. Loss of society due to the death of her son;

b. Loss of love due to the death of her son;

c. Loss of companionship due to the death of her son;

d. Punitive damages.

LXXIV.

As a result of the actions of the Defendants, which proximately caused the death of K.W., K.W., by and through Plaintiff, Mocha Myers, has suffered the following damages:

a. Pain and suffering from the time he began taking Oxbryta through the date of his death;

b. The present value of K.W.'s estimated net earnings over the course of his life, from the date of his death until the anticipated date of K.W.'s death had he not been prescribed Oxbryta;

c. Punitive damages.

## REQUEST FOR TRIAL BY JURY

The Plaintiff is entitled to, and demands, a trial by jury.

**WHEREFORE, PREMISES CONSIDERED,** the Plaintiffs, Mocha Myers, individually, and on behalf of her minor son, K.W., hereby demand judgment of and from the Defendants, both jointly and severally, in an amount which is reasonable, together with pre- and post-judgment interest, plus costs, and to any and all relief to which the Plaintiffs may justly be entitled, plus punitive damages, and any other relief the Court may deem appropriate.

**RESPECTFULLY SUBMITTED, this the 14th day of September 2026.**

**Mocha Myers, on behalf of her minor son, K.W., Plaintiff**

/s/ William H. Eckert
WILLIAM H. ECKERT (MSB # 102412)
DANIEL G. COLLARINI (MSB # 106464)
**ECKERT AND TARLETON, LLC**
1317 26th Avenue, Suite 357
Gulfport, MS 39501
(O): 228-206-2676; (F): 228-205-3744
bill.eckert@eandtlaw.com

-AND-

MICHAEL J. TARLETON (MSB # 101812)
**ECKERT & TARLETON, LLC**
141 West Peace Street
Canton, MS 39046
(O): 601-368-8844; (F): 601-368-8426
Mike.tarleton@eandtlaw.com

-AND-

TOBY TATUM (MSB # 106064)
**TATUM LAW FIRM PLLC**
1317 26th Avenue, Suite 357
Gulfport, MS 39501
(O): 228-209-0378; (F): 228-215-1214
tatumtoby@gmail.com